**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TERRY HELMUTH ROMBOT, ) </br> ) </br> Petitioner, ) </br> v.           ) </br> ) </br> STEVEN J. SOUZA,             ) </br> ) </br> Respondent.  ) | Civil Action </br> No. 17-11577-PBS |

**MEMORANDUM**

November 8, 2017

Saris, C.J.

**INTRODUCTION**

On October 30, 2017, Petitioner Terry Rombot, an Indonesian citizen who has lived in the United States for approximately sixteen years, moved to be released from Immigration and Customs Enforcement ("ICE") detention. See Docket No. 42. Rombot was in custody at the Bristol County House of Corrections. He based his challenge on violations of the Due Process Clause of the Fifth Amendment and ICE's promises, policies, and procedures.[1]

After an evidentiary hearing on October 20, 2017, and a hearing on November 1, 2017, the Court allowed Rombot's Motion

---

[1] Rombot is also a named plaintiff in the companion case, Devitri et al. v. Cronen et al., 1:17-cv-11842-PBS, in which the Court stayed removal pending a review of its jurisdiction. See Docket Nos. 14, 17, 28, 61 in Devitri.

1

for Release and/or Bond Determination (Docket No. 42).[2] See Docket No. 49. During the November 1, 2017 hearing, the Court stated its reasons for release and added that a memorandum with further discussion of its reasons would be issued.

## FACTUAL BACKGROUND

The factual background is taken from the allegations in Rombot's petition, documents he allegedly received from ICE, and the testimony of Supervisory Detention and Deportation Officer Timothy Stevens at the evidentiary hearing.

Rombot received his final order of removal in 2008. Then, in 2010, as part of "Operation Indonesian Surrender," Rombot voluntarily surrendered to ICE officials and was given an Order of Supervision.

Operation Indonesian Surrender was an ICE program involving a population of Indonesian Christians who say they feared religious persecution in Indonesia. The program grew out of cooperation between ICE and New Hampshire churches serving Indonesian Christians. It was branded by ICE as "a humanitarian effort" with a purpose of "bringing folks out of the shadows." Docket No. 1-2 at 1. For a few weeks in 2010, ICE set up a mobile command center in the parking lot of the Strafford County

---

[2] Finding that it had jurisdiction, on October 25, 2017, the Court denied the government's motion to dismiss the habeas corpus petition. See Docket No. 37.

district courthouse in Dover, New Hampshire. Indonesian nationals living in New Hampshire under final orders of removal were invited to report to ICE during or soon after the mobile command center initiative. In exchange for their voluntary surrender, they would receive Orders of Supervision if they did not have a criminal history. Rombot's Order of Supervision required him to check in periodically with ICE and stated that his "failure to comply with the terms of [the] order may subject [him] to a fine, detention, or prosecution." Docket No. 1-6 at 1.

A few years later, the United States Attorney for New Hampshire prosecuted Rombot for failure to depart the United States, a violation of 8 U.S.C. § 1253(a)(1). Rombot spent approximately two months in jail, and on May 21, 2015, was sentenced to time served by Judge Paul J. Barbadoro, based on the Government's recommendation. See Docket No. 1-3 at 2:25-3:13, 8:5-14. That same month, Rombot was put on an airplane in New York City to leave the United States. Rombot was removed from the airplane, however, when ICE officials in Washington, D.C. overruled the local office and decided that Rombot should be allowed to stay in the United States.

On May 28, 2015, Rombot was released from custody and received a "Release Notification" from ICE. The Release Notification stated that "[a] violation of one of [sic] more of

3

[the supervision] conditions, or of any local, state or federal law may result in [Rombot] being taken back into custody and any bond that [he] may have posted being forfeited." Docket No. 1-5 at 1. Importantly, the Release Notification also said that Rombot would "be given an opportunity to prepare for an orderly departure" when he had to leave the United States. Id. Rombot alleges that he at all times has complied with the requirements of his Release Notification and Order of Supervision. At the evidentiary hearing, Officer Stevens confirmed Rombot's full compliance.

Rombot reported to the Manchester, New Hampshire ICE office, as required by his Order of Supervision, on August 1, 2017. Without advance notice, he was detained, placed in shackles, and later given a "Notice of Revocation of Release." Field Office Director Christopher Cronen wrote that Rombot was being revoked because "ICE ha[d] determined that there [was] a significant likelihood of removal in the foreseeable future in [his] case." Docket No. 1-9 at 1. According to the Notice of Revocation of Release, dated August 1, 2017, Rombot was detained "pursuant to 8 CFR 241.13 [sic]" and would "promptly be afforded an informal interview at which [he would] be given the opportunity respond [sic] to the reasons for the revocation." Id. Rombot remained in ICE custody from August 1, 2017 to

4

November 1, 2017. There is no evidence in the record that he was given an informal interview.

While he was in custody, Rombot also received a "Notice to Alien of File Custody Review" dated October 13, 2017. The notice read: "If ICE has not removed you from the United States within the removal period . . . the ICE Deciding Official will review your case for consideration of release on an Order of Supervision." Docket No. 43-1 at 1. According to the notice, Rombot's custody status would be reviewed on or about October 30, 2017. See id. The notice further stated that Rombot could "submit any documentation [he] wish[ed] to be reviewed in support of [his] release, prior to" October 30, 2017. Id.

Prematurely, on October 24, 2017, Field Office Director Cronen issued a "Decision to Continue Detention."[3] In the decision, ICE claimed that it was "based on a review of [Rombot's] file and/or [his] personal interview and consideration of any information [he] submitted to ICE reviewing officials." Docket No. 50 at 1. Field Office Director Cronen further wrote that after reviewing the facts in Rombot's case, "including [his] criminal arrests for obstructing a court order

---

[3] ICE points out that, also on October 24, 2017, government counsel filed a different Notice of Detention (Docket No. 36) in response to this Court's order (Docket No. 34). That notice simply informed the Court of ICE's intent to continue Rombot's detention.

5

and failure to appear," Field Office Director Cronen decided that Rombot "would pose a safety risk to the community" if released from custody. Id. Nothing in the record supports the reasons in the decision, which are directly contradicted by Officer Stevens' testimony at the evidentiary hearing that Rombot had complied with his conditions of release.

## DISCUSSION

### I.  Statutory Framework

After an alien is ordered removed, Congress mandated that, in general, ICE "shall remove the alien from the United States within a period of 90 days," 8 U.S.C. § 1231(a)(1)(A), which begins on "[t]he date the order of removal becomes administratively final," the date of a court's final disposition if the removal order is judicially reviewed, or "the date the alien is released from [non-immigration] detention," whichever comes latest, id. § 1231(a)(1)(B). The removal period may be extended "and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents . . . or conspires or acts to prevent the alien's removal." Id. § 1231(a)(1)(C). If, however, the alien is not removed by ICE during the 90-day removal period, "pending removal, [he] shall be subject to supervision under regulations prescribed by the Attorney General." Id. § 1231(a)(3) (emphasis added); see

6

also 8 C.F.R. § 241.5(a) (setting conditions to be included in an order of supervision).

In some cases, aliens "determined . . . to be a risk to the community or unlikely to comply with the order of removal," inadmissible aliens, or removable aliens "may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)." Id. § 1231(a)(6). ICE contends Rombot is "inadmissible" under 8 U.S.C. § 1182. The Supreme Court has determined that ICE cannot indefinitely detain these classes of aliens in the post-removal period. See Zadvydas v. Davis, 533 U.S. 678, 701 (2001). Rather, the Court has set the "presumptively reasonable period of detention" under section 1231(a)(6) to be six months. Id. ICE has its own regulations for the process that must be afforded to aliens held under section 1231(a)(6). See 8 C.F.R. § 241.4.

Finally, the Supreme Court has made it clear that "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas, 533 U.S. at 693.

## II. Rombot's Detention

ICE maintains that it had statutory authority to detain Rombot under either 8 U.S.C. § 1231(a)(1)(C) or 8 U.S.C. § 1231(a)(6). The government argues that the removal period has been extended beyond the typical 90 days, because Rombot

7

"act[ed] to prevent" his removal by filing applications for administrative stays. See Rodriguez-Guardado v. Smith, No. 17-11300-RGS, 2017 WL 4225626, at *2 (D. Mass. Sept. 22, 2017) (holding that "[s]eeking and securing a discretionary stay unquestionably prevents petitioner's removal" and citing favorably cases that "have found delays attributable to an alien's legal challenges to a removal order to extend the 90-day removal period"). However, the argument that the removal period was extended and detention was therefore justified under section 1231(a)(1)(C) is foreclosed by Rombot's Order of Supervision, where ICE made the decision not to deport him before the removal period expired: "Because [ICE] has not effected your deportation or removal during the period prescribed by law, it is ordered that you be placed under supervision . . . ." Docket No. 1-6 at 1. Based on the evidence in the record, including ICE's own statements, the Court concludes that 8 U.S.C. § 1231(a)(1)(C) is inapplicable.

ICE also argues that 8 U.S.C. § 1231(a)(6) grants it authority to detain Rombot beyond the removal period. While this is true, the agency also has the statutory authority to release aliens "subject to the terms of supervision in [8 U.S.C. § 1231(a)(3)]." 8 U.S.C. § 1231(a)(6). In this case, ICE took the latter course of action. So, the issue before the Court is whether Rombot was properly revoked.

The Notice of Revocation of Release cites 8 C.F.R. § 241.13, entitled "Determination of whether there is a significant likelihood of removing a detained alien in the reasonably foreseeable future." See Docket No. 1-9 at 1. The "special review procedures" in section 241.13 apply to aliens detained under the custody review procedures in section 241.4 after the expiration of the removal period "where the alien has provided good reason to believe there is no significant likelihood of removal to the country to which he or she was ordered removed . . . in the reasonably foreseeable future." 8 C.F.R. § 241.13(a). To apply section 241.13, ICE must "make[] a determination . . . that there is no significant likelihood of removal in the reasonably foreseeable future." Id. § 241.13(b)(1). There is no indication in the record that Rombot ever provided to ICE "good reason to believe" his deportation would not occur in the "reasonably foreseeable future" or that ICE ever made the requisite finding of that fact. While the regulatory scheme is complex, ICE appears to have relied on an inapplicable regulation in revoking Rombot.[4]

If ICE intended to revoke Rombot's release, it was required to follow the procedures set out in 8 C.F.R. § 241.4. It did not. The Executive Associate Commissioner or the district

---

[4] The government seems to acknowledge that ICE relied on the wrong regulation. See Docket No. 47 at 5 n.2.

director has the discretion to revoke an alien "to enforce a removal order." 8 C.F.R. § 241.4(l)(2). The reason given for Rombot's revocation -- "a significant likelihood of removal in the foreseeable future" -- shows that ICE intended to enforce his removal order. However, the record demonstrates the revocation decision was made by Field Office Director Cronen. See Docket No. 1-9 at 1. It is not clear from the regulation, which refers to previous Immigration and Naturalization Service position titles, whether an ICE field office director has authority to revoke an alien. See 8 C.F.R. § 241.4(l)(2). The record does not show that Field Office Director Cronen ever made the threshold determination that Rombot's "revocation [was] in the public interest and circumstances [did] not reasonably permit referral of the case to the [equivalent of the Executive Associate Commissioner]." Id. Upon revocation, sections 241.4 and 241.13 both require ICE to provide "an initial informal interview promptly . . . to afford the alien an opportunity to respond to the reasons for revocation." Id. §§ 241.4(l)(1), 241.13(i)(3). Nothing in the record shows that Rombot was given this interview.

ICE's Decision to Continue Detention, issued on October 24, 2017, was brought to the Court's attention by Rombot's counsel during the November 1, 2017 hearing on the motion for release. Counsel for ICE seemed to know nothing about it. In the letter,

10

Field Office Director Cronen represents that his decision to continue Rombot's detention until at least January 28, 2018 was "based on a review of [Rombot's] file . . . and consideration of any information [he] submitted to ICE reviewing officials." Docket No. 50 at 1. However, on October 24, 2017, Rombot's counsel had not yet submitted any documentation in support of Rombot's release. The Notice to Alien of File Custody Review had stated that evidence could be submitted until the October 30, 2017 deadline. See Docket No. 43-1 at 1. When it reviewed Rombot's custody status prematurely on October 24, 2017, ICE violated its own regulations and procedures, see 8 C.F.R. § 241.4, depriving Rombot of his right to a meaningful custody status review. Also in the Decision to Continue Detention, Field Office Director Cronen labeled Rombot "a safety risk to the community" based on his "review of the facts in [Rombot's] case, including alleged "criminal arrests for obstructing a court order and failure to appear." Docket No. 50 at 1. ICE has presented no evidence to support these alleged arrests or Field Office Director Cronen's ultimate "safety risk" determination. This decision is evidence of ICE's utter disregard for the agency's own procedures.

ICE, like any agency, "has the duty to follow its own federal regulations." Haoud v. Ashcroft, 350 F.3d 201, 205 (1st Cir. 2003) (quoting Nelson v. I.N.S., 232 F.3d 258, 262 (1st

11

Cir. 2000)). To be sure, not every procedural misstep raises a constitutional issue. See Matias v. Sessions, 871 F.3d 65, 72 (1st Cir. 2017) (involving an inaccurate translation). However, where an immigration "regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute," like the opportunity to be heard, "and [ICE] fails to adhere to it, the challenged [action] is invalid . . . ." Waldron v. I.N.S., 17 F.3d 511, 518 (2d Cir. 1993); see also Ying Fong v. Ashcroft, 317 F. Supp. 2d 398, 403-04 (S.D.N.Y. 2004) (granting alien's habeas petition where she was deported fewer than 72 hours after her arrest and regulation mandated 72-hour rule). Based on ICE's violations of its own regulations, the Court concludes Rombot's detention was unlawful.

ICE also violated the Due Process Clause of the Fifth Amendment when it detained Rombot on August 1, 2017. In its order denying ICE's motion to dismiss, this Court found that Rombot did not violate any condition of his release, but was not given "an opportunity to prepare for an orderly departure" as specifically provided in the Release Notification. Docket No. 37 at 5. ICE's reliance on Rodriguez-Guardado to support Rombot's detention is misplaced because the court in that case did not address conditions of release that expressly provided for an opportunity to prepare for an orderly departure. See 2017 WL 4225626 at *1-3. When ICE ignored that condition and placed

Rombot in shackles, it did so without advance notice, a hearing, or an interview.

Counsel for ICE has never asserted that Rombot is a danger to the community or a flight risk, or that he violated the conditions of his Order of Supervision.[5] See 8 U.S.C. § 1231(a)(6); 8 C.F.R. § 241.4(d), (l). Rather, ICE claims that the Field Office Director has unfettered discretion to incarcerate Rombot. While ICE does have significant discretion to detain, release, or revoke aliens, the agency still must follow its own regulations, procedures, and prior written commitments in the Release Notification. As described above, ICE failed to follow its own regulations in at least three ways. The Supreme Court has recognized that an "alien may no doubt be returned to custody upon a violation of [supervision] conditions," Zadvydas, 533 U.S. at 700, but it has never given ICE a carte blanche to re-incarcerate someone without basic due process protection.

## CONCLUSION

For the foregoing reasons, the Court allowed Rombot's Motion for Release and/or Bond Determination (Docket No. 42) and

---

[5] The government did not rely on Field Office Director Cronen's "safety risk" determination, Docket No. 50 at 1, in either the hearing on November 1, 2017 or Respondent's Opposition to Petitioner's Motion for Release (Docket No. 47).

13

released him pursuant to the conditions in his preexisting Order of Supervision.

                                               /s/ PATTI B. SARIS  
                                               Patti B. Saris  
                                               Chief United States District Judge